[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a memorandum of Decision as to a post judgment motion filed by the defendant, Allyson Esten seeking to relocate her residence with the minor child of the parties. The child in this case, William Holley, IV was born on March 24, 1994. The parties had a very brief relationship prior to their marriage, and were married on October 23, 1993. After the birth of the child in March of 1994, a dissolution action was filed in August of 1995, which action went to judgment on December 13, 1996. The current motion is the defendant's Motion for Permission to Relocate and to Reopen Judgment and Modify the Visitation Schedule and to Designate Primary Custodial Parent, Post-Judgment, dated November 20, 1998.
The defendant presently resides in Cromwell, and the plaintiff in Middletown, adjoining towns in Middlesex County, Connecticut. The child resides with the parties pursuant to the terms of the judgment. The defendant seeks permission for a move from Cromwell, Connecticut to the Southborough/Westborough area of Massachusetts which is located near the intersection of the Massachusetts Turnpike and Interstate Route 495.
This motion was tried to the Superior Court at Middlesex County under the Regional Family Trial Docket. During the trial, the court heard testimony from Dr. Kenneth Robson, a psychiatrist with offices in West Hartford, Connecticut. Dr. Robson had undertaken a study pursuant to a stipulation of the parties. A family relations study was not done as a result of the parties having stipulated to the study by Dr. Robson. In addition to the testimony of Dr. Robson. the plaintiff presented the testimony of Dr. James Black and Dr. Donald Heibel, a psychiatrist and psychologist, respectively, both of whom reviewed the report of Dr. Robson and met with the plaintiff, William Holley. Both the plaintiff and defendant testified. The child's pediatrician, one of his pre-school teachers, and several other lay witnesses also testified.
While this matter can generally be called a "relocation case" there are CT Page 9376 several important distinctions which should be noted at the outset. Initially, it should be noted that both parties have indicated in their trial briefs that the court should not impose the standard articulated by our Supreme Court in the matter of Ireland v. Ireland, 246 Conn. 413
(1998) insofar as it imposes a shifting burden of proof in a matter where one parent is designated the primary custodian of the minor child, or has sole custody of the minor child. It is urged that the reason the standard in Ireland should not apply here is because there is no designation in the original judgment of a primary custodial parent. The court agrees with the argument of counsel. However, it will apply the standards ofIreland v. Ireland to the extent of its analysis of the best interest of the child. Those factors, which evolved from an analysis of Tropea v.Tropea, 87 N.Y.2d 727, 665 N.E.2d 145, 642 N.Y.S.2d 55 (1996), were adopted by our Supreme Court in it's holding in Ireland. Examination of the best interests of the child under these circumstances requires the court to consider
 "Each parent's reasons for seeking or opposing the move, the quality of the relationships between the child and the custodial and non-custodial parents, the impact of the move on the quantity and quality of the child's future contact with the non-custodial parent, the degree to which the custodial parents and child's life may be enhanced economically, emotionally, and educationally by the move and the feasibility of preserving the relationship between the non-custodial parent and child through suitable visitation arrangements . . . the negative impact, if any from continued or exacerbated hostility between custodial and non-custodial parents and the affect that the move may have on any extended family relationships."
 Ireland v. Ireland, 246 Conn. 413, 431-432 (1998).
Ireland states that the factors recited in Tropea ". . . should not be considered exclusive, nor should any single factor be presumed to carry dispositive weight. Moreover, any other facts or circumstances that could have a bearing on the court's determination of the child's best interest should be considered and given the appropriate weight in the court's analysis." Id., at 434-435.
Accordingly, the court finds that the defendant, as the moving party, must bear the burden of proof by a preponderance of the evidence that such move is proposed for a legitimate purpose, that the relocation is reasonable in light of that purpose, and also that the relocation is in the best interest of the child. CT Page 9377
In support of her position, the defendant has alleged that her purpose for seeking the relocation are to enhance the education of the child and her own opportunity for better employment, to be near her extended family, to be in closer proximity to the person with who she now enjoys a relationship, and to distance herself from her relationship with the plaintiff Mr. Holley.
The evidence has not shown that there would be any enhancement of the child's education as a result of his move to Massachusetts. While there was some indication that Ms. Esten might have broader employment opportunity in Massachusetts, there is substantially the same opportunity available to her in this same area.
On the other hand, both of her parents live in Cape Cod and she has two siblings both of whom live in the greater Boston area. It is also significant that Ms. Esten has no family in the Middletown area where she currently resides. Certainly, a move to Massachusetts would bring her closer to her family and to her primary network of support which would be of benefit to her.
The evidence also indicates that at least part of the motivation for her seeking relocation is her relationship with a Mr. James Carney which is of some four years duration. While Mr. Carney has not committed to entering into marriage with Ms. Esten, Ms. Esten has testified that he has committed to participation of the financing the purchase of a home for her. Mr. Carney was interviewed as part of the evaluation done by Dr. Robson, who has addressed the status of that relationship in the context of his report. It is unclear that Mr. Carney will move his residence from Boston in the event Ms. Esten moves. It is evident that Ms. Esten would request permission to move regardless of her relations hip with Mr. Carney. While the court is willing to consider the relationship between Ms. Esten and Mr. Carney as being a motivating factor for the defendant's proposed relocation, the court does not find it to be the principal factor of the defendant's proposed move. It is not, in and of itself, a legitimate purpose for moving.
The remaining motivation offered by the defendant in her purpose for relocation is in order to distance herself from the plaintiff. To that end, the defendant, the plaintiff and others have testified extensively as to the nature of the relationship between the parties both prior, during, and subsequent to the marriage. Indeed, the history of hostility between the parties and the continuation, and arguably the escalation, of those hostilities is the central issue of this matter. While both parties stated that the marriage between them was intended to benefit the child, the marriage did not accomplish its intended result. Unfortunately, the CT Page 9378 resulting relationship is one of tremendous animosity which has continued from the time of the dissolution. For her part, the defendant regards Mr. Holley as controlling, inflexible, insulting and demeaning of her. For his part, the plaintiff regards Ms. Esten as inadequate, ineffective, and self-centered. They each regard the other as vindictive. They are each mistrustful of each other, and each other's intentions. They each provide ample justification for the other. While there had been some limited efforts to co-parent, their animosity and distrust for each other has sabotaged the few attempts that have been made. The examples cited as being examples of their potential to co-parent are sadly lacking. While the parents have been able to attend some of the same school functions and have together watched the child playing at a beach, those activities do not rise to the level of co-parenting. More typical of their behavior is attending pediatrician's appointments together so that they can monitor each other's comments. The present state of the relationship between the parents is precisely what prevents them from being able to co-parent this child. The relationship is a poor one. The stress of this relationship is palpable, and detrimental to both parties as well as the child. The court finds that the defendant's purpose for relocating in this respect is legitimate.
The judgment in this case provides a parenting schedule which was a result of a family relations custody mediation. It is remarkable that the schedule indicates that the mediation took approximately nine hours. Among other things, the schedule provides that the father will have one mid-week overnight visitation each week. It provides that during any given month, two midweek overnight access periods will run from 3 p.m. to 8 a.m. the following morning, and two overnight access periods will run from 5 p.m. to 8 a.m. the following morning. The schedule contains a provision that the plaintiff father will not go more than five nights without overnight access except under vacation circumstances. The mother has one full weekend with the child in every four weekend month. During those months that have five weekends, she has a second full weekend. She cannot have two consecutive weekend access periods except during vacations. Within those confines, the mother is to provide the father with her monthly work schedule so as to pick her weekends, and by doing so, determine the father's. Thanksgiving and Christmas are divided on an alternating year basis, as are Easter, the Fourth of July and other holidays. Each of the parties have the option of up to four weeks vacation in each summer. It is required that they provide 30 days notice to the other parent. It is also required that not more than one week of vacation will occur consecutively. Finally, the agreement provides that if either party contemplates relocation, they would provide the other parent 90 days written notice of their intention to do so.
The terms of the parenting schedule provide ample ground for the CT Page 9379 parties to engage each other. They must frequently contact the other to coordinate plans. They each share the perception that the other controls the schedule. There are frequent problems which become further sources of animosity and stress. However, the evidence has shown, and the court finds, that in spite of their relationship, both parents in this matter have a loving and caring relationship with their only son. While they differ as to parenting styles and their care and concern for their son is genuine. The minor child is described by Dr. Robson as appealing, open, gregarious, and socially adept. It is clear from the testimony of both parents as well as Dr. Robson that this child has a substantial and healthy attachment to both parents. He is well adjusted in school, he enjoys his time spent with both parents, his extracurricular activities. He enjoys the company of his grandparents, particularly his paternal grandmother. William reportedly indicated to Dr. Robson that he felt he would have a better life if his parents lived together. Unfortunately, that idea has not improved with age. Also, William missed each parent when he was with the other and is described by Dr. Robson as being "upbeat and hopeful and seemed to be coping better than many children in this situation with his parents conflicts." Clearly, that is not to say that he is a child free from all the worries, problems, difficulties and stress of this situation. He does suffer from the ongoing conflict between the parents. He has been frequently exposed to demeaning comments made by each parent about the other. He has been used to carry messages of both appropriate and inappropriate content. He has been present when the parents received calls from each other and failed to answer or hung up. He has been present when his parents have yelled at each other. His normal activities such as his attendance at school and at camp provide ammunition and weapons for his parents to fire at each other. He has been used as the only pawn in these ongoing hostilities.
The court concludes that the defendant's desires to relocate her residence are for the legitimate purposes of moving closer to her family and to separate from the continued hostility between herself and the plaintiff. The court further finds the move reasonable in light of that purpose. While the distance between the parties proposed would be greater than the distance presently, it will not be of such nature that it will substantially affect the relationship between the plaintiff and his child. Suitable orders can be made so that the relationships between parents and the child are preserved and the nature and quality of the visitation between parent and child can be maintained. While the contact between the plaintiff and his son may not have the same frequency, the reduction of the contact between the parents will ultimately be of benefit to the child.
It is important to note that this case, unlike many reported decisions, does not involve a move of such a distance as to require CT Page 9380 travel by airplane. In many cases, a legitimate objection is posed to relocation from Connecticut to states such as California, Florida and in one case, Tennessee. Those are circumstances substantially different from those contemplated here. The impact of traveling by airplane, due to its economic and practical considerations is significantly greater than the impact of traveling by automobile for less time than it would take to traverse a small state such as ours.
The defendant's motion for permission to relocate and to reopen judgment is granted in part. The following orders are entered:
The defendant shall be allowed to relocate her residence to a distance no greater then one hour and fifteen minutes by automobile from her present residence in Cromwell, Connecticut.
The plaintiff's midweek overnight access shall be changed from four times in any given month to two times in any given month. Those times shall be selected by the plaintiff on or before the first day of each month, after the defendant selects her weekend access.
The provision of the parenting schedule known as the "five day" provision is eliminated.
The weekend schedule presently in place shall remain the same. That portion of the schedule which provides for summer visitation shall be modified so that the parties shall equally divide the entire summer vacation of the minor child between them. Vacation times may be up to three weeks consecutively. The parties shall choose vacation periods by alternating choices of dates. The plaintiff shall have first choice of a period of up to three weeks, the defendant shall have second choice, the plaintiff third choice and etc. The plaintiff shall provide notice to the defendant of his choice of vacation dates, on or before May 1st of each year. All summer vacation scheduling shall be completed on or before May 4th of each year. The vacation schedule shall supercede all other visitation and access, including summer holidays. The child's summer vacation will commence on the second day following the last school day and shall end two days prior to the first day of classes.
For all exchanges of the child, the defendant and the plaintiff shall share equally the transportation for the minor child in order to accomplish the access schedule. The parties may do this by meeting at a distance half way between the residence of the parties, or by agreeing to provide one leg of the trip with the other party to provide the return portion.
The remaining provisions of the judgment shall remain in full force and CT Page 9381 effect.
Robaina, J.